Deshaune DARLING, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 470, 1999.

Supreme Court of Delaware.

Submitted: Jan. 17, 2001.
Decided: March 16, 2001.

Bernard J. O'Donnell, Esquire, Assistant Public Defender, Wilmington, Delaware, for appellant.

John Williams, Esquire, Deputy Attorney General, Dover, Delaware, for appellee.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER, and STEELE, Justices (constituting the Court en Banc).

HOLLAND, Justice:

Following a jury trial, the defendant-appellant, Deshaune Darling, was convicted of Possession with Intent to Deliver Marijuana, Possession of Drug Paraphernalia and Resisting Arrest. He was acquitted of Wearing a Disguise During the Commission of a Felony. For Possession with Intent to Deliver Marijuana, Darling was sentenced to, *inter alia*, five years imprisonment at Level V, suspended after three years for six months at Level IV Home Confinement and eighteen months

at Level III. For Possession of Drug Paraphernalia, Darling was sentenced to one year at Level V, suspended for six months at Level III and six months at Level II. For Resisting Arrest, Darling was sentenced to one year at Level V suspended for one year at Level I.

This is Darling's direct appeal. The sole issue presented is Darling's contention that the Superior Court erroneously denied a pretrial motion to suppress evidence of marijuana. According to Darling, there was no basis for the police to reasonably suspect that he had engaged in any criminal activity. Darling contends that the police violated his right to be free from unreasonable searches and seizures as set forth in both the United States Constitution and the Delaware Constitution.[1]

The Superior Court concluded that the State presented a reasonable articulable suspicion of criminal activity for the police to stop and detain Darling. The Superior Court held that Darling abandoned the marijuana as he was fleeing from the police when they properly attempted to detain him. Accordingly, the Superior Court denied Darling's motion to suppress.[2]

We have concluded that the State not only demonstrated an articulable suspicion of criminal activity but established probable cause for the police to make a warrantless arrest of Darling. Consequently, the marijuana was properly seized pursuant to that warrantless arrest and was admissible as evidence pursuant to both the United States Constitution and the Delaware Constitution. Therefore, the judgment of the Superior Court is affirmed, albeit on an alternative basis.

### Suppression Hearing Testimony

The only witness who testified at the suppression hearing was Delaware State Police Corporal Rodney L. Workman. Corporal Workman was assigned to the special investigations tactical unit involved with "the open air drug markets in Kent and Sussex Counties."[3] On August 19, 1997, the special investigations tactical unit was working in Williamsville at an area known as "the Hole." According to Corporal Workman, the Hole "is a dirt lane off the paved highway which opens up into some mobile homes. The dirt lane is about three hundred yards in length with only one way in and that same way out." Corporal Workman identified the Hole as "one of those areas where people stand out along the road and sell drugs."

Corporal Workman testified that on August 19, 1997, he was working with Delaware State Police Corporal Warren McGee. They drove an unmarked vehicle down the dirt road leading to the Hole. Both were dressed in civilian clothes. The two police officers stopped their automobile approximately one hundred yards away from a group of individuals. Corporal Workman testified that "one black male was standing beside a blue Lincoln. He had on blue jeans, a bandana on his head, a red bandana covering his nose and face, wearing it as a mask. The blue Lincoln pulled away, drove past Detective McGee and I. We observed an elderly white man driving the vehicle." At the pre-trial suppression hearing, Corporal Workman iden-

---

1. U.S. Const. amend IV; Del. Const. art. I, § 6.

2. The Superior Court based its ruling upon the United States Supreme Court decision in *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). That decision was subsequently distinguished by this Court's opinion in *Jones v. State*, Del. Supr., 745 A.2d 856 (1999). Although the parties address those cases in supplemental briefs, neither decision is dispositive in Darling's case.

3. When the special investigations tactical unit was created, there were thirty-six areas identified as open-air drug markets in Kent and Sussex Counties. As of the time of the suppression hearing, Corporal Workman testified that during his ten-year career he had made approximately fifty arrests for drug related offenses. The majority of these arrests were made as a member of the special investigations tactical unit.

tified Darling as the individual he observed wearing the red bandana mask.

After the blue Lincoln left the Hole, Corporal Workman and McGee drove a little further down the dirt lane. Corporal Workman testified that after the male with the red bandana finished "dealing" with the gentleman in the blue Lincoln, he walked back to a white shed where several other people were standing around. Corporal Workman testified that when he and McGee "drove further in, the other black males wearing masks approached us. We made a u-turn and left the area before they could get too close to us."

Corporal Workman testified that after observing the individuals wearing masks and Darling's "dealing with the gentleman in the blue Lincoln", he and Corporal McGee returned to their office. There, they changed into camouflage clothing and formulated a plan to return to the Hole and arrest the suspects. The plan was for uniformed officers of the Delaware State Police to enter the Hole from one direction while Workman and three members of the special investigations tactical unit approached the suspects from the back through the woods.

When Corporal Workman returned to the Hole, he was able to crawl through the woods to a location approximately thirty yards away from Darling. From that vantage point, Corporal Workman testified that he "watched the same subject with a red bandana and red mask on. A car pulled up, he pulled his mask up, walked out, made a deal, walked back, pulled his mask down and starting chatting with the others again." At this point, Corporal Workman was contacted by radio and advised that the uniformed Delaware State Police officers were coming down the dirt road.

As the uniformed officers approached down the dirt road, Corporal Workman testified that he and the other members of the special investigations tactical unit "jumped up, took off after them yelling, State Police, get on the ground. Four subjects I believe took off running, one of them being defendant, Darling who had on two red bandanas, one on his head and one around his neck." During the ensuing foot chase, Corporal Workman observed Darling reach into his right front pocket and throw a white plastic bag on the ground. Darling dove into a briar bush in an attempt to hide. Corporal Workman and McGee, however, were able to apprehend and handcuff him.

Corporal Workman then retrieved the white bag that Darling had thrown on the ground. Corporal Workman discovered a brown paper bag inside containing a clear cellophane bag with what appeared to be marijuana. When Darling was patted down by the police, they also discovered a large amount of United States currency in his left front pocket.

### *Warrantless Arrest Standard*

■ We have concluded under the unique circumstances of this case, that the police conduct in carrying out a plan to surround Darling at gunpoint and order him to the ground was more than a seizure but, in fact, constituted an arrest under both the United States Constitution and the Delaware Constitution.[4] Therefore, we must determine whether the police had probable cause to arrest Darling at the time that they emerged from the woods.[5] If the police did have probable cause at the time of the arrest, the bag of marijuana is admissible as the product of a lawful seizure.

■ A police officer is empowered to make a warrantless arrest for any felony, if he or she has "reasonable grounds" to

**4.** *See Jones v. State,* Del.Supr., 745 A.2d 856 (1999). *See also Quarles v. State,* Del.Supr., 696 A.2d 1334 (1997).

**5.** *See Quarles v. State,* 696 A.2d at 1337 ("'[An arrest] may occur only when police have established probable cause that the suspect has committed a crime.").

believe the person to be arrested has committed the crime.[6] "Reasonable grounds" has been interpreted to be synonymous with probable cause.[7] This Court has said that:

> 'Probable cause is an elusive concept which avoids precise definition.... It lies somewhere between suspicion and sufficient evidence to convict.' For this reason, probable cause is measured by the totality of the circumstances through a case by case review of 'the factual and practical considerations of everyday life on which reasonable and prudent men [act].'[8]

A finding of probable cause is necessarily case-specific. A determination of the existence of probable cause for a warrantless felony arrest is based on a "totality of the circumstances."[9] Courts generally require that " 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.' "[10] Courts must review probable cause determinations in light of "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act."[11]

### Probable Cause Established

In Darling's case, Corporal Workman testified candidly that he could not see precisely what was exchanged between Darling and the driver of the Lincoln. Nevertheless, based upon his police training and experience, Corporal Workman concluded that the masked male was "dealing [drugs] with the gentleman in the blue Lincoln." Corporal Workman testified that he personally observed Darling make a second "deal" with the driver of a different vehicle later the same day. These personal observations by an experienced police officer at a known open-air drug sale area constituted sufficient probable cause to arrest Darling for contraband drug dealing.[12]

### Conclusion

The marijuana was properly seized as incident to Darling's lawful arrest. The judgments of the Superior Court are affirmed.

6. 11 *Del. C.* § 1904(b)(1); *Thomas v. State*, Del.Supr., 467 A.2d 954, 957 n. 3 (1983); *Gardner v. State*, Del.Supr., 567 A.2d 404, 409 (1989).

7. *Thomas v. State*, 467 A.2d at 957 n. 3.

8. *O'Neil v. State*, Del.Supr., 691 A.2d 50, 54 (1997) (citations omitted).

9. *Gardner v. State*, 567 A.2d at 409; *Coleman v. State*, Del.Supr., 562 A.2d 1171, 1177 (1989) ("The requisite analysis in determining the sufficiency of probable cause for a warrantless arrest is determined according to a 'totality of the circumstances' test."); *Thompson v. State*, Del.Supr., 539 A.2d 1052, 1055 (1988).

10. *United States ex rel. Hawkins v. Anderson*, D. Del., 343 F.Supp. 200, 201 (1972) (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)).

11. *Hovington v. State*, Del.Supr., 616 A.2d 829, 833 (1992) (quoting *Thompson v. State*, Del.Supr., 539 A.2d 1052, 1055 (1988)).

12. *Quarles v. State*, Del.Supr., 696 A.2d 1334 (1997).